COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-328-CV

WESTERN RESERVE LIFE      APPELLANTS

ASSURANCE COMPANY OF OHIO, 

INTERSECURITIES, INC., AND 

TIMOTHY HUTTON 

V.

DAVID GRABEN AND APPELLEES

FRANK STRICKLER 

------------

FROM THE 271ST DISTRICT COURT OF WISE COUNTY

------------

OPINION

------------

I.  INTRODUCTION

In three issues, Appellants Western Reserve Life Assurance Company of Ohio (“WRL”), Intersecurities, Inc. (“ISI”), and Timothy Hutton (together, “the Brokers”),
(footnote: 1) assert (1) that the trial court made errors of law when awarding damages, (2) that the evidence is neither legally nor factually sufficient to support the jury’s findings of liability and damages-enhancing conduct, and (3) that the trial court committed procedural and evidentiary errors in charging the jury.  We affirm in part, reverse and render in part, and reverse and remand in part.   

II.  FACTUAL AND PROCEDURAL BACKGROUND

This is the case of the spiritual advisor turned investment advisor.  ISI is a financial investment company that has 2,400 registered representatives nationwide, including Hutton, an ISI agent.  Appellees David Graben and Frank Strickler were two of Hutton’s clients.

A. Timothy Hutton

Hutton had previously been a pastor.  When he turned forty, he decided that he wanted a career change; he wanted to do something that would allow him to “bless people.”  Hutton claimed the financial investment business provided him “the opportunity to be a blessing to others.”  Even after he became a financial advisor, he remained a part-time preacher and retained the “privilege . . . [of performing] marriage ceremonies and funerals for some of my clients.”  Hutton had no college degree and no formal education in financial management; none of Hutton’s seventy college hours related to financial management.

B. David Graben

David Graben flew for American Airlines for almost thirty-four years until March 1997, when he retired from American Airlines at the age of sixty.  Graben elected to receive his American Airlines retirement in the form of a cash settlement, which he then placed into an IRA that was managed by his financial advisor at the time, Joe Marshall.  In 1999, Graben became dissatisfied with Marshall and approached Hutton about moving his investments to Hutton’s firm.

Prior to becoming a client of Hutton, Graben met twice with Hutton and told Hutton that he wanted to preserve his principal.  Hutton assured Graben that the principal would be protected.  Graben testified, “[a]nd I told him, I want to make the maximum amount of money you can safely make, but don’t ever lose the principal, and they laughed.  And they said, oh, lose the principal, of course not.  We would not lose your principal.”  Graben also told Hutton that he wanted his investment to provide a monthly income off which he would live. Graben indicated that his long-range plans included leaving his investments to his grandchildren. 

During their meetings, they further discussed Graben’s financial goals and options for Graben’s assets of approximately $2.5 million.  Graben wished to maximize his return and minimize his risk.  Although Graben testified that preserving his principal was important to him, he also understood that investing in the market carried a risk, that he could lose money, and that Hutton had no crystal ball that would allow Graben to be in the market on upswings and out of it in downturns.  Hutton responded to this information by telling Graben that he should move his investment to Hutton so that Hutton could move Graben back “towards the more safe side.”  Graben specifically testified that he relied on what Hutton and Hutton’s partner, Al Demicell, had told him.

In his investment application form, Graben ranked his investment objectives with “long-term growth” first, “income” second, and “short-term growth” third.  Although “safety of principal” was a choice, he did not place it among his top three goals.  Based on Graben’s criteria, Hutton recommended a WRL variable annuity, in which the assets are invested in a group of subaccounts that function like mutual funds.  Hutton asserted that one of the unique features of a variable annuity was its ability, through its death benefit, to marry Graben’s goal of receiving potential market growth with protection against market downturns.  This benefit purported to lock in the highest value reached by the account on an anniversary of the policy issuance, less withdrawals.  Thus, the death benefit guaranteed that Graben’s family would receive the highest value the account reached, including net gains, even if the value had declined at the time of his death.  This was supposed to mean that the principal initially invested, less the insured’s withdrawals of principal, was preserved for his estate, along with investment gains in the account.

Although Hutton was a “commissioned broker”—which meant that Hutton’s compensation was based on an initial commission paid by the insurance company—when he sold Graben the variable annuity, he also undertook to monitor Graben’s investments and give financial advice.  These services are not required of a commissioned broker, but Hutton assumed the role of Graben’s “financial advisor,” even though he did not ask to be paid a fee for his services as is customary with a fee-based financial advisor.  Hutton testified, “I said as a commissioned broker from a technical standpoint, I do not have that responsibility.  But I also said that as a decent individual, and as an honorable person, I have gone beyond that, and I have provided investment advice to them, and acted as a financial advisor.”

Hutton described how he monitored the investments’ subaccounts by referring to leading independent sources such as Morningstar ratings, reviewing the quarterly statements, insisting on only the highest-rated funds, advising Graben to make allocation changes as needed, and consulting with Graben.  In selecting funds, Hutton looked at several criteria, including the experience level of the fund managers, the volatility or risk level of the funds, and the funds’ performances.  Financial documents, telephone logs, and the testimony of Hutton’s partner, Demicell, confirmed that Hutton took the above steps before selecting funds.

From 1999 to early 2000, the stock market and Graben’s investments did well, and Graben was happy with Hutton.  In March 2000, however, Graben’s investments began declining with the market.  In addition to the market decline, Graben also made withdrawals from his investments account. Hutton and Graben spoke about the decline, and Graben suggested moving his money into cash.  Hutton counseled against such a move, as it would “lock in the losses,” and advised Graben to ride out the rough period.  Hutton had explained to Graben how the market was cyclical and had a chart in his office tracking the history of the market, which he used with clients to illustrate the market trends.  Graben could have directed Hutton to move his investments out of the market, but instead he took Hutton’s advice and remained in the market.

On October 21, 2001, Hutton sent Graben a letter stating that he had invested in a new computer system “to help me do a better job of what you ultimately pay me to do:  Monitor your investments and keep you posted on any changes or recommendations to your financial plan.”  Graben presented this letter at trial to support his complaint of misrepresentation.

Following the September 11 terrorist attacks, Graben’s investments continued to slide with the market.  Graben’s investments, though losing money, actually performed better than the market benchmarks, the S&P 500, and the NASDAQ Fund and also performed better over this period than if he had remained in his prior investments with Marshall.  By 2003, the stock market began rebounding.  In September 2003, Graben moved his investments to another financial advisor, Michelle Brennan Hall, but by the time of trial—over a year and a half later—Hall had not made substantive changes to Hutton’s allocation of Graben’s investments.  As of December 2004, Graben’s investments had regained their losses and showed a net gain of $143,317. Based on a $2.5 million original investment, this gain represented a 5.7% return over five years, or about 1% per year.

Although Graben was not happy that his retirement investments lost considerable value while he was a client of Hutton and had questioned Hutton whether there was a way to “stop the loss,” he understood that “Mr. Hutton did not have anything to do with the downturn of the economy.”  He also did not believe that Hutton was dishonest.

C. Frank Strickler

Frank Strickler was also an American Airlines pilot, retiring in September 1997 when he turned sixty.  Strickler also elected to take a lump sum settlement at the time of retirement and then placed his American Airlines retirement funds into an IRA managed by Marshall,  whom Strickler found to be very difficult to access because Marshall had many clients and was very busy.  Graben thereafter referred Hutton to Strickler.  Hutton and Demicell contacted Strickler and then met with him to discuss how they could help him manage his IRA.  Hutton and Demicell informed Strickler that their firm, Demicell & Hutton, was small, that the firm hand-picked its clients, and that they provided extraordinary personal attention and personal advice for those hand-picked clients.  Strickler specifically informed Hutton that Strickler’s goal was to preserve the principal of his retirement benefits, to have the principal earn income to support his modest lifestyle, and to be able to leave his principal to his wife.  After Hutton and Demicell met with Strickler in March 2000, Strickler decided to invest through Hutton.  Strickler already had three variable annuities with other companies, all of which he transferred to Hutton.  He also purchased a WRL variable annuity from Hutton, for which Hutton received a commission. When he began using Hutton, Strickler’s investments totaled approximately $2.5 million.  Strickler testified that preservation of principal was his primary objective but, like Graben, his application form listed “growth,” “aggressive growth,” and “income” as his top priorities.  Hutton explained to Strickler that the death benefit aspect of the variable annuity was a good fit for Strickler as well because it enabled him to guarantee gifts to support his interests after his death.

As with Graben, Hutton continued to monitor Strickler’s investments after his initial investment, checking their Morningstar ratings and risk factors, looking for any change in fund management, and conferring with Strickler.  At one point, Strickler suggested that Hutton move his non-WRL annuities into his WRL annuity, but Hutton advised against such a move.  According to Hutton, although he would have earned more commissions by making the change, he  advised against it because Strickler would incur penalties in the process.  Scott Lenhart, ISI’s Chief Compliance Officer, testified that Hutton did not take this opportunity to earn additional commissions upon assuming Graben’s and Strickler’s accounts, as many brokers would, which was a mark of his integrity.

Like Graben, Strickler understood that there was a possibility he would lose money in the stock market and that Hutton had no crystal ball.  When the market began declining, Strickler, like Graben, asked Hutton about moving money into cash positions, but Hutton counseled against locking in his losses and advised Strickler to ride out the bad market.

Strickler informed Hutton that Strickler did not have education, background, experience, or sophistication concerning investments and that he was totally dependent upon Hutton’s counsel and advice.  Hutton’s phone logs show that in May 2002, Strickler informed Hutton that he wanted to simplify his investment.  Strickler specifically inquired whether his current allocations were the best or whether changes needed to be made.  When Strickler suggested to Hutton that he should go ahead and change his investments (and incur any attendant penalties) so that he would not continue to lose so dramatically, Hutton simply advised against it, as he had with Graben, and the market continued to decline.

During the downturn, Strickler never ordered Hutton to move his investments out of their equity positions, nor did he opt to move his investments on his own.  Hutton took over Strickler’s accounts in early 2000 just as the market was peaking and immediately prior to the market’s beginning its slide, and he held Strickler as a client during the entire market decline.  Concerning this decline, Strickler acknowledged that Hutton had “inherited this—this downturn in the market.”  By July 2003, Strickler had met with Hutton and informed him that something had to be done because Strickler could not continue to sustain the continuing losses.  At this meeting, Hutton told Strickler that he had a new computer program and a new investment strategy that was totally, diametrically, and dramatically different than the one he had been using.  Strickler testified that when he and his wife left the meeting, he realized something was wrong.  In September 2003, Strickler moved his investments to Hall, who did not change the allocation strategy set by Hutton.  By December 2004, Strickler’s investments had regained most of their losses, with a total net loss of $132,739.  Based on a $2.5 million investment, this loss represented a 5.2% decline over a three-and-a-half year period, or about a 1.5% decline per year.

In sum, both Strickler and Graben, collectively the “Clients,” told Hutton from the very beginning that they were dependent on Hutton for his counsel, experience, and advice, and Hutton admitted that he knew the Clients were not sophisticated investors.  Hutton also knew that the Clients wanted to preserve their principal so that they could pass this money along to their families and acknowledged that the Clients told him that their goal was to “preserve as much of the principal as they could for posterity.”  Finally, Hutton admitted that he had a responsibility to determine the appropriate suitability of the Clients’ investments.

When soliciting the Clients, Hutton repeatedly represented himself as a “financial advisor.”  However, Hutton did not tell the Clients that by placing their money into variable annuities, Hutton was putting the Clients into what was later alleged to be a high-risk, aggressive investment that was unsuitable for the Clients but that did produce a sizable $80,000 commission for Hutton. Hutton also purportedly failed to tell the Clients that by his placing their investment in a variable annuity, Hutton did so as a “commissioned broker” and that a commissioned broker had no further obligation to provide financial advice to the client after the sale.

According to the Clients, and unbeknownst to them at the time, Hutton and ISI committed other allegedly wrongful acts leading to this lawsuit, including the following:

(1) Hutton misrepresented that he was being paid to monitor Graben’s and Strickler’s accounts.

(2) Hutton misrepresented that he was not just monitoring, but was also “managing,” Graben’s and Strickler’s accounts. 

(3) In the context of (1) and (2) above, ISI internal documents revealed that advertising and representing yourself as a financial advisor, like Hutton did to Graben and Strickler, can be confusing and misleading.  Hutton knew this.  Hutton’s representation to Graben and Strickler that he was a financial advisor was a violation of ISI’s rules.  ISI knew Hutton was representing himself as a financial advisor even though they knew he was a commissioned broker.

(4) When soliciting Strickler’s investments, Hutton took Strickler to the offices of a professional fund/portfolio management company, which Hutton represented would provide expert management.  This advertising/sales representation by Hutton directly violated ISI rules.

(5) Hutton admitted that he knew it was critical to Graben and Strickler that their principal be preserved.  Yet, on Graben’s and Strickler’s new account forms, which Hutton sent to ISI, Hutton did not check the available box requesting “safety of principal.”

The Clients filed suit together on August 29, 2003, alleging that Hutton made misrepresentations, violated the insurance code, committed negligent acts, and breached a fiduciary duty.  They also sued ISI for its own acts and, along with WRL, for vicarious liability for Hutton’s acts.  Asserting that there was no legal or factual basis for the Clients to join their two separate lawsuits into one, except as a tactic to prejudice the jury, the Brokers moved to sever the claims.  The Brokers contended that the Clients’ claims had nothing in common except the same defendants and the same lawyers.  The trial court refused to sever and tried the claims jointly.

D. Trial and Damages

At trial, both sides presented expert testimony on damages.  The Clients’ expert, Dr. Scott Hakala, “disapproved of” the advice of all three of the  Clients’ advisors—Marshall, Hutton, and Hall.  Dr. Hakala testified that Hutton had placed their money in funds that were too aggressive and too heavily invested in equities, which was a “recipe for disaster.”  Dr. Hakala used a damage model that was based on the performance of two funds that had outperformed the market from March 2000 until August 2003; he concluded that if Hutton had placed the Clients in these investments, picked in hindsight according to the Brokers, Graben should have earned $418,000, and Strickler should have earned $860,600, including his non-WRL accounts.  However, Dr. Hakala also testified that he would not have recommended his own damage model if he were allocating the Clients’ funds.  In concluding that Hutton’s allocations were too aggressive, Dr. Hakala did not research the actual holdings in the subaccounts of each fund but concluded they were “aggressive” by looking at the names of the funds.  Dr. Hakala also testified that by placing the Clients in the aggressive-type investments, Hutton violated the standard of care owed by financial advisors.  The Brokers’ experts purportedly looked beneath the fund titles to the subaccounts and the funds’ investment objectives.  When the Brokers pointed out to Dr. Hakala that Hall, whom the Clients retained in September 2003, had made virtually no changes to the investments, Dr. Hakala asserted that Hutton had waited until the summer of 2003 to move the Clients into a more “moderate” position that Hall then followed, a claim he later admitted was in error.
(footnote: 2)
 The Brokers’ expert, Karyl Misrack, showed that the Clients’ “moderate” investment allocation as of summer 2003 had actually been in place for up to two years under Hutton’s direction.  Misrack further took issue with Dr. Hakala’s findings, noting that an examination of the actual subaccounts showed that the funds were more balanced than Dr. Hakala stated because the fund managers themselves had been relocating the various funds into more conservative positions as the market fell.  She opined that the losses were caused entirely by the market decline, not by Hutton’s and ISI’s actions.

The Brokers also presented the expert testimony of Bernard Young, a former district director of the National Association of Securities Dealers (NASD) who had experience in investigating customer complaints against securities brokers.  He described the NASD’s rule on suitability and testified that Hutton’s investment recommendations for the Clients were suitable.  He also stated that Hutton’s recommendation to stay in the market during a downturn was a widely accepted strategy, and he described and approved of the manner in which Hutton monitored the investments.  He explained how the Morningstar “beta” ratings of the Clients’ subaccounts indicated that they were far from an “extremely aggressive” position.  Like Misrack, he attributed the decline in the Clients’ investments entirely to market forces over which Hutton had no control.

E. The Verdict and Judgment

The jury returned a verdict for the Clients on all claims—insurance code violations, negligence,
(footnote: 3) and breach of fiduciary duty.  The trial court’s judgment awarded the same amount of actual damages for each of the insurance code and breach of fiduciary duty causes of action ($104,500 to Graben and $215,300 to Strickler), as well as disgorgement of commissions for breach of fiduciary duty ($66,000 to Graben and $14,000 to Strickler) and prejudgment interest on these amounts.
(footnote: 4)  The judgment also awarded additional damages for knowing violations of the insurance code in the amount of $75,000 for each Client against Hutton; exemplary damages in the amount of $2 million to each Client against ISI, as Hutton’s principal, based on the jury’s finding of fraud; and attorney’s fees in the amount of $219,000 to the Clients jointly.  The trial court also granted the Clients a directed verdict against WRL and ISI on their respondeat superior claims “for the acts, omissions, and conduct of Timothy Hutton.”  The trial court denied the Brokers’ post-trial motions, and this appeal followed.

III.  SUFFICIENCY OF THE EVIDENCE

The Clients’ three causes of action for which the jury awarded them damages were their insurance code claims, breach of fiduciary duty claims, and negligence claims.  Because the 
Clients did not elect to recover on the jury’s negligence findings, the trial court’s final judgment awarded damages for the Clients’ insurance code claims and breach of fiduciary duty causes of action only.  
In their second issue, the Brokers assert that there is neither legally nor factually sufficient evidence to support the jury’s findings of liability and damages-enhancing conduct on the part of Hutton or ISI.  

A. Standards of Review 

A legal sufficiency challenge may only be sustained when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact.  
Uniroyal Goodrich Tire Co. v. Martinez
, 977 S.W.2d 328, 334 (Tex. 1998),
 cert. denied
, 526 U.S. 1040 (1999);
 Robert W. Calvert, 
“No Evidence”
 
and “Insufficient Evidence” Points of Error
, 38 T
EX
. L. R
EV
. 361, 362-63 (1960)
.  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact-finder could, and disregard evidence contrary to the finding unless a reasonable fact-finder could not.
  
City of Keller v. Wilson
, 
168 S.W.3d 802, 827
 (Tex. 2005). 

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.  
Garza v. Alviar
, 395 S.W.2d 821, 823 (Tex. 1965).  We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding.  
Mar. Overseas Corp. v. Ellis
, 971 S.W.2d 402, 406-07 (Tex.), 
cert. denied
, 525 U.S. 1017 (1998).

B. Materiality and Causation of the Clients’ Insurance Code Claims 

In their petition, the Clients alleged that 
the Brokers’ actions relating to the sale and management of their investments violated the Texas Insurance Code because the Brokers engaged in unfair and deceptive acts by making false representations to them.  
See 
Act of April 25, 1957, 55th Leg., R.S., ch. 198, § 1, secs. 3-4, 1957 Tex. Gen. Laws 401, 401-03 (repealed 2003) (current version at 
Tex. Ins. Code Ann.
 §§ 541.003, .051-.061 (Vernon Supp. 2006)).  They further alleged that they were entitled to recover for these violations because they had sustained actual damages that were caused by these misrepresentations.

On appeal, the Brokers claim that the Clients failed to prove that any allegedly wrongful actions or representations caused the Clients damage because (1) whether Hutton was a commissioned broker or a financial advisor was immaterial and did not cause the Clients damage, (2) an October 23, 2001 letter relied on by the Clients during trial was also immaterial and did not cause damage, and (3) Hutton performed as he promised he would—he monitored the Clients’ investments and gave the Clients advice, which they accepted.  Hence, according to the Brokers, the Clients did not prove that Hutton caused them any damages.   

The Clients respond by pointing out that Hutton represented to the financially unsophisticated Clients that he would monitor and manage their accounts;
(footnote: 5) that he assumed the role of, and acted as, their financial advisor; and that he failed to comply with ISI’s own recommendations regarding financial investing by placing them in a virtually 100% stock portfolio that was not diversified into bonds or other investments.  Further, Hutton admitted that he was aware of information important to the Clients, such as their desires to preserve their principal investments and leave inheritances for their children and grandchildren, when they came to him.  However, evidence relating to the suitability of investments or any failure on Hutton’s part to meet the Clients’ investment requirements is not evidence of and cannot support any insurance code violation that was submitted because it does not relate to the types of unfair or deceptive acts that are prohibited by the insurance code.   

The insurance code violations were submitted by Jury Question numbers 1 and 2, which inquired as to any “false, misleading, or deceptive” acts or practices defined as (1) misrepresenting the rights or remedies conferred by an agreement; (2) making, publishing, or disseminating before the public any advertisement, announcement, or other statement with respect to the business of insurance that was untrue, deceptive, or misleading; (3) making an untrue statement of material fact; (4) failing to state a material fact necessary to make other statements made not misleading; or (5) making a statement in such a manner as to lead a reasonably prudent person into a false conclusion of material fact.  

The gravamen of each of the Clients’ claims for insurance code violations was that Hutton and ISI made misrepresentations.  In contrast, the allegedly unsuitable recommendations, placement, and handling of the investments were separate claims covered by separate theories of breach of fiduciary duty, negligence, and negligent misrepresentation, which were submitted by separate jury questions.  Accordingly, we conclude that when the evidence regarding the alleged violations of the insurance code is properly considered in light of the actual jury questions and definitions submitted, there is no evidence of any insurance code violation that caused the Clients any damages.  
See Osterberg v. Peca
, 12 S.W.3d 31, 55 (Tex. 2000) (holding that sufficiency of evidence must be reviewed in light of jury charge actually submitted).  

The record is undisputed that Hutton 
held licenses as both a commissioned broker and an investment advisor representative and that he was also authorized to act as a fee-based financial advisor.
(footnote: 6)  The evidence was, again, undisputed that he did exactly what he said he would do:  he monitored the Clients’ investments, provided ongoing investment advice, managed their accounts, reviewed the accounts, and advised the Clients periodically. 

Hutton admitted that he told Graben and Strickler he would continue to provide advice and monitor their accounts.  And the evidence is overwhelming that he did that.  Graben and Strickler testified that they relied on Hutton’s advice, and Strickler recalled that they had good rapport.  Hutton testified that he provided ongoing advice; he understood he had an ongoing responsibility; he held a “sacred trust”; and he monitored their accounts as an investment advisor. 

Hutton monitored the investments’ subaccounts by reference to sources such as the Morningstar ratings and review of quarterly statements.  He made recommendations for the highest-rated funds and advised the Clients of needed allocation changes in their accounts.  He utilized several criteria in choosing funds, including the experience level of the fund managers, the volatility of the stocks, and the performance level of the funds.  Thus, Hutton’s representations that he was monitoring the accounts were true, not false statements of any material fact.

Graben and Strickler also complained that Hutton misrepresented to them that they would never lose their principal.  But both Clients acknowledged that they knew they could lose money in the market.  They acknowledged in writing that they knew they could lose money.  When both Clients voiced concerns regarding the falling market, Hutton advised them that it would rise again—as it did—and that they were better off to stay in rather than to “lock in their losses” at the bottom of the downturn.  These statements were not misrepresentations of existing fact, nor even promises of future performance but, at most, merely constituted financial advice that the Clients accepted.  They acknowledged that Hutton had no magic wand or crystal ball and could not predict the market’s future.  Moreover, the significant feature of the variable annuity vehicle for their investments was shown to be the death benefit guaranteeing that the Clients’ families would receive the highest value reached by the investments on an anniversary of the annuity, less withdrawals, even if the actual value had declined by the time of death.    

The only representation Hutton made that was shown to be false was his statement in the letter of October 2001 that he was monitoring the Clients’ accounts for a “fee,” when he was, in fact, not charging them for that ongoing service.  The Clients made much noise about this misrepresentation.  But it was a nonissue.  Graben and Strickler had no complaint about not being charged a fee.  Graben actually admitted that Hutton had told him he would continue to monitor his accounts “for free” and testified that did not cause him any concern.  Graben also admitted that he did not even know the difference between a broker and a financial advisor until trial and that he did not know the technicalities of the compensation.  His concerns were that Hutton should have placed him in something that was “rock solid” at his age and time of life and that Hutton did not do anything to stop the decline in his investments in the downturn of the market.  Strickler likewise testified that his grievance was that Hutton did not do anything when the losses became “dramatic.”

Graben and Strickler did not contend that any of the claimed misrepresentations by Hutton, nor the approval of some statements by ISI, caused their damages, and there is no evidence that they did.  Their real complaint was that Hutton failed to place or allocate their funds in investments that provided a suitable allocation of risk for their circumstances.  Their expert, Dr. Hakala, provided no opinions as to causation of any damages resulting from misrepresentations but addressed only the issue of the amount of damages that, in his opinion, were caused by breach of the fiduciary duty Hutton owed as a financial advisor or as a broker to provide proper financial advice and to place the Clients in diversified, balanced portfolios with equal proportions of bonds and equities.

We hold that the evidence is legally insufficient to support the findings in Jury Question numbers 1 and 2 of violations of the insurance code and that the Clients are not entitled to recover under this theory for their damages.  This holding dictates that the Clients also are not entitled to recover additional damages for “knowing” violations of the insurance code, attorney’s fees, or prejudgment interest for their insurance code claims.  

C. Fiduciary Relationship

Having concluded that the evidence is insufficient to support the jury’s verdict on the Clients’ insurance code claims, we now turn to the Brokers’ argument that there was insufficient evidence that a fiduciary relationship existed between Hutton and the Clients, or that if one did exist, there was insufficient evidence that it was breached.  

1. 
Existence of a Fiduciary Duty

Hutton maintains that there was no relationship of trust and confidence between himself and the Clients, that he did not owe them a duty beyond placing orders as instructed and not making unauthorized trades, and that there was insufficient evidence that even if a duty did exist, that it was breached by him.  The Clients argue that both a formal and informal fiduciary relationship existed between Hutton and the Clients.  Specifically, the Clients alleged that Hutton owed a fiduciary duty based on the formal relationship of principal and agent, as well as based on an informal relationship of trust and confidence.

As evidence of this fiduciary relationship, the Clients assert that Hutton himself testified that the relationship he had with the Clients was a “very sacred trust” and that he treated them “better than I would treat myself”; that the Brokers’ own expert, Bernard Young, testified that “someone who represents themself as an investor advisor has a heightened responsibility to review the account and act as a fiduciary”; that Hutton also owed the Clients a fiduciary duty based on the formal relationship of principal and agent; and that brokers and financial advisors owe fiduciary duties.  
See Romano v. Merrill Lynch, Pierce, Fenner & Smith
, 834 F.2d 523, 530 (5th
 Cir. 1987), 
cert. denied
, 487 U.S. 1205 (1988); 
Hand v. Dean Witter Reynolds, Inc
., 889 S.W.2d 483, 492 n.5 (Tex. App.—Houston [14th
 Dist.] 1994, writ denied) (stating that the relationship between an agent and a principal is a fiduciary one); 
Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc
., 337 F. Supp. 107, 111 (N.D. Ala. 1971), 
aff’d
, 453 F.2d 417 (5th
 Cir. 1972) (stating that broker/dealer who also acts as an investment advisor occupies a fiduciary relationship).  Further, the Clients assert, and we agree, that the foregoing admissions by Hutton and Young, as well as ample other evidence, support the jury’s finding that a relationship of trust and confidence existed between Hutton and the Clients.  

The Brokers rely on 
Meyer v. Cathey
, 167 S.W.3d 327, 331 (Tex. 2005),
 
and
 Schlumberger Technology Corp. v. Swanson
, 959 S.W.2d 171, 176-77 (Tex. 1997)
,
 
to argue that for a court to impose a fiduciary or confidential relationship in a business transaction, the relationship must exist prior to, and apart from, the agreement made the basis of the lawsuit.  First, it should be noted that the Brokers did not tender to the trial court an alternative written instruction containing an instruction to the jury that a prior and separate relationship is required.  Accordingly, the Brokers failed to preserve their argument that there must be evidence of a prior and separate relationship. 
See
 
Tex. R. Civ. P.
 278.

Second, and more importantly, the holdings in 
Schlumberger 
and 
Meyer
 are distinguishable.  
Schlumberger
 and 
Meyer
 stand for the proposition that in a true arms’-length business transaction, where one party is denying that it owes a fiduciary relationship, the court will exercise caution before imposing a confidential/fiduciary relationship on the parties.  
Meyer
, 167 S.W.3d at 330-31;
 Schlumberger
, 959 S.W.2d at 176-77.  The Texas Supreme Court noted in those cases that “[i]n order to give full force to contracts, we [courts] do not create such a relationship lightly.” 
 Meyer
, 167 S.W.3d at 331; 
Schlumberger
, 959 S.W.2d at 177.  Obviously, when a person such as Hutton is acting as a financial advisor, that role extends well beyond a simple arms’-length business transaction.  An unsophisticated investor is necessarily entrusting his funds to one who is representing that he will place the funds in a suitable investment and manage the funds appropriately for the benefit of his investor/entrustor.  The relationship goes well beyond a traditional arms’-length business transaction that provides “mutual benefit” for both parties.  In 
Meyer
, the Supreme Court noted that arms’-length transactions entered into for the parties’ “mutual benefit” did not necessarily establish a basis for a fiduciary relationship.  
Meyer
, 167 S.W.3d at 331. 

By Hutton’s own admission, his relationship with the Clients went well beyond mere “mutual benefit.”  Hutton specifically testified that he told his clients that he treats them “better than [he] would treat [himself].”  Simply put, when Hutton assumed the role to act as a financial advisor to the Clients and to monitor and manage their investments, any arms’-length business transaction that may have existed between the parties was elevated into a fiduciary relationship by the very nature of Hutton’s actions.  
See Schlumberger
, 959 S.W.2d at 176 (“An informal relationship may give rise to a fiduciary duty where one person trusts in and relies on another, whether the relation is a moral, social, domestic, or purely personal one.”).  The Brokers’ own expert witness agreed, stating that Hutton, as a financial advisor, had a heightened responsibility to review the Clients’ accounts and to act as a fiduciary. Therefore, we reject the Brokers’ argument that in this case a fiduciary relationship must exist prior to, and apart from, the agreement made the basis of this lawsuit.  We hold that the evidence demonstrates the existence of a fiduciary relationship between Hutton and the Clients.

2. 
Breach of the Fiduciary Duty

Next, the Brokers argue that even if Hutton did owe a fiduciary duty to the Clients, he did not breach that duty because his only duty was to execute the trade orders that the Clients authorized.  
See Hand
, 889 S.W.2d at 492 n.5 (stating that the fiduciary duty owed by a stock broker to a customer is confined to executing the orders that he or she has accepted from the customer and is “very narrow—primarily not to make unauthorized trades”).  Here, though, Hutton was much more than a mere order-taker to the Clients—he acted as a financial advisor whom the Clients trusted to monitor the performance of their investments and recommend 
appropriate financial plans to them.  Accordingly, the duty that Hutton owed the Clients went well beyond the “narrow” duty of executing trade orders.

The Brokers further argue that the evidence failed to establish a breach of Hutton’s fiduciary duty because there was no evidence that Hutton failed to put the Clients’ interests above his own or treated the Clients unfairly. However, the jury was charged that it could also find that Hutton breached his fiduciary duty if he failed to show that he made reasonable use of the confidence that the Clients placed in him, that he acted in the utmost good faith and exercised the most scrupulous honesty toward the Clients, or that he fully and fairly disclosed all important information to the Clients concerning the transaction.  
See 
Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges: Fiduciary Duty 
PJC § 104.2 (2003).  

The testimony of Dr. Hakala, the Clients’ expert witness, provided evidence that Hutton did not make reasonable use of the confidence placed in him by the Clients.  Dr. Hakala testified that the investments that Hutton selected for the Clients were not appropriate or reasonable because they were too aggressive for the Clients’ needs.  He explained that because the Clients were at retirement age and needed current income from their investments, almost all financial advisors would have recommended the Clients’ money to be invested more in the bond market rather than in equity funds due to the reduced risk of loss that bond funds provided.  Instead, Hutton put almost all of the Clients’ money into equity stocks and recommended leaving it there even when the market tumbled, which Dr. Hakala termed “a recipe for disaster.”

The Brokers contend that Hutton’s investment recommendations were not unsuitable because the Clients’ new broker, Hall, kept essentially the same allocation strategy that Hutton recommended after the Clients moved their accounts to Hall in 2003.  But Dr. Hakala testified that the investments were unsuitable from the outset, in 1999 and 2000, when Hutton first recommended the equity-based variable annuities; thus, even if the new broker did keep the same allocation strategy in 2003, this action does not necessarily speak to the suitability of the same allocation strategy under the conditions of the market three to four years earlier.

The Brokers also complain about the Clients’ failure to list “safety of principal” as one of their priorities and Strickler’s client profile stating his risk tolerance level as “high” and defining his objectives as “growth,” “aggressive growth,” and “income.”  However, Hutton himself testified that he knew that the Clients wanted to preserve as much of their principal as possible for posterity and that it was important to the Clients to preserve the retirement funds for their families.

Anything more than a scintilla of evidence is legally sufficient to support the jury
’
s finding that Hutton breached his fiduciary duty to the Clients.  
See Cont’l Coffee Prods. Co. v. Cazarez
, 937 S.W.2d 444, 450 (Tex. 1996); 
Leitch v. Hornsby
, 935 S.W.2d 114, 118 (Tex. 1996). 
 We conclude that more than a scintilla of evidence exists because the evidence discussed above furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of Hutton
’
s breach of fiduciary duty.  
See Rocor Int’l, Inc. v. Nat’l Union Fire Ins. Co.
, 77 S.W.3d 253, 262 (Tex. 2002).  Accordingly, we hold that there was legally sufficient evidence to support the jury’s verdict.  
Furthermore, because the evidence supporting the jury’s finding that Hutton breached his fiduciary duty is not 
so weak and the evidence to the contrary is not so overwhelming that the finding should be set aside, we also hold that there was factually sufficient evidence to support the jury’s verdict.  
See
 
Garza
, 395 S.W.2d at 823. 

D. Fraud

Having concluded that the evidence is legally and factually sufficient to support the jury’s verdict on the Clients’ breach of fiduciary duty claims, we now examine the jury’s finding that Hutton committed fraud while breaching his fiduciary duty because this fraud finding was the basis of the jury’s $2 million punitive damages award for the Clients.  The Brokers argue that there is not clear and convincing evidence to support the jury’s finding that Hutton committed fraud.  The jury was charged with the following definition of “fraud”:

Fraud occurs when a party makes a material misrepresentation, the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, the misrepresentation is made with the intention that it should be acted on by the other party, and the other party acts in reliance on the misrepresentation and thereby suffers injury.  

Misrepresentation means a false statement of fact, or a promise of future performance made with an intent, at the time the promise was made, not to perform as promised, or a statement of opinion that the maker knows to be false, or an expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion.

The gist of fraud is successfully using cunning, deception, or artifice to cheat another to the other’s injury.  
McEwin v. Allstate Tex. Lloyds
, 118 S.W.3d 811, 816 (Tex. App.—Amarillo 2003, no pet.).  In reviewing the jury’s finding of fraud by clear and convincing evidence, we must apply a heightened standard of review and determine whether a reasonable juror could form a firm belief or conviction that the finding of fraud was true.  
Sw. Bell Tel. Co. v. Garza
, 164 S.W.3d 607, 627 (Tex. 2004).  

Here, there was no evidence that Hutton used cunning, deception, or artifice to cheat the Clients.  Furthermore, while the Clients allude to the fact that Hutton received a large up-front commission by placing the Clients’ money in variable annuities, the Clients failed to show that Hutton had nefarious motives for investing their money as he did.  Hutton had no financial motive to ignore the Clients’ wishes.  He even gave up the opportunity to make more commissions by declining to move an investment as Strickler had suggested because Hutton felt that it was not in Strickler’s best interest.  In sum, the Clients never articulate why Hutton would have been motivated to place them in unsuitable investments, much less prove that he acted fraudulently in doing so.  Accordingly, we hold that there was legally and factually insufficient evidence of Hutton’s fraud.

Consequently, because the evidence is insufficient to support the jury’s fraud finding, the punitive damage awards cannot be upheld.  Therefore, the Clients are not entitled to recover punitive damages from the Brokers for Hutton’s breach of fiduciary duty.

E. Sufficiency Holdings

In summary, we hold that there was legally insufficient evidence of causation to support the Clients’ insurance code claims, so we sustain the Brokers’ second issue as to the insurance code claims.  We further hold that while there was legally and factually sufficient evidence of the existence and breach of a fiduciary duty owed by Hutton to the Clients, there was not clear and convincing evidence of any fraud committed by Hutton.  Therefore, we overrule the Brokers’ second issue as to the breach of fiduciary duty claims, but we sustain it as to the punitive damages award.  

IV.  DAMAGE AWARDS

Because we have held that the jury’s verdict in favor of the Clients on their claims of insurance code violations and punitive damages is not supported by the evidence, the Clients’ only remaining possible recoveries are their breach of fiduciary duty claims and their negligence claims.  Assuming, without deciding, that there was sufficient evidence to support the jury’s verdict for the Clients on their negligence claims, we now address the Brokers’ first issue, in which they assert that the trial court made errors of law when awarding damages and attorney’s fees, and examine whether the Clients may properly recover on both their negligence and breach of fiduciary duty causes of action. 

A. One Satisfaction Rule 

The one satisfaction rule provides that a plaintiff may recover only for the damages suffered as a result of a particular injury.  
Utts v. Short
, 81 S.W.3d 822, 833 (Tex. 2002); 
Foley v. Parlier
, 68 S.W.3d 870, 882 (Tex. App.—Fort Worth 2002, no pet.).  Here, the Clients alleged that they suffered only one injury: loss of value to their annuity contracts.  The jury awarded identical economic damages for each of the Clients’ three theories (insurance code violations, breach of fiduciary duty, and negligence): $104,500 for Graben and $215,300 for Strickler.  Even though the jury found the Brokers to have been negligent, the court did not award the Clients anything for their negligence causes of action in the final judgment.

Under the one satisfaction rule, a plaintiff must elect a remedy in order to prevent him from obtaining more than one recovery for the same injury.  
Waite Hill Servs., Inc. v. World Class Metal Works, Inc
., 959 S.W.2d 182, 184 (Tex. 1998).  To allow the Clients to recover under both their breach of fiduciary duty claims and under their negligence claims would permit an impermissible double recovery.  Therefore, we hold that the Clients may recover either under their breach of fiduciary duty claims or under their negligence claims, but not both.  Accordingly, we now turn to the Clients’ two remaining causes of action—breach of fiduciary duty and negligence—to determine which of these remaining claims presents them with the greatest possible recovery.

The jury awarded Graben $104,500 in economic damages for his negligence claim.  Graben was also awarded a total of $170,500 ($104,500 in economic damages and $66,000 in profit disgorgement) for his breach of fiduciary duty claim.  Therefore, Graben’s greatest possible recovery lies with his breach of fiduciary duty claim.  
As for Strickler, the jury awarded him $215,300 in economic damages for his negligence claim.  Strickler was also awarded a total of $229,300 ($215,300 in economic damages and $14,000 in profit disgorgement) for his breach of fiduciary duty claim.  Thus, Strickler’s greatest possible recovery also lies with his breach of fiduciary duty claim.

Accordingly, because the one satisfaction rule prohibits double recovery, and because the Clients’ breach of fiduciary duty causes of action provide the greatest possible recovery to both Graben and Strickler, we hold that the trial court’s judgment in favor of the Clients on their breach of fiduciary duty causes of action is proper but that neither Client is entitled to recover on his negligence claim.
(footnote: 7)  

B. Award of Attorney’s Fees for Breach of Fiduciary Duty

Having determined that the Clients may recover only on their breach of fiduciary duty causes of action, we now turn to the Brokers’ complaint that trial court erred by awarding the Clients attorney’s fees for their breach of fiduciary duty claims.  We agree.  Attorney’s fees are not available for a breach of fiduciary duty claim.  
Hooks v. Hooks
, No. 02-03-00263-CV, 2004 WL 1635838, at *2 (Tex. App.—Fort Worth July 22, 2004, no pet.) (mem. op.) (citing 
Musquiz v. Marroquin
, 124 S.W.3d 906, 913 (Tex. App.—Corpus Christi 2004, pet. denied)).  Therefore, the trial court erred by awarding the Clients attorney’s fees for their breach of fiduciary duty claims, and we sustain that portion of the Brokers’ first issue.
(footnote: 8)  

V.  ASSERTED PROCEDURAL, EVIDENTIARY, AND CHARGE ERRORS

In their third issue, the Brokers contend that the trial court committed various procedural and evidentiary errors and errors in charging the jury, causing the course of trial to be improperly biased against the Brokers.  We disagree.

A. Trial Court’s Refusal to Sever Graben’s and Strickler’s Claims 

The Brokers first assert that the trial court erred by failing to sever the claims of Graben from those of Strickler because each client made separate, individual investments that had nothing to do with the other client’s investment.  The trial court has broad discretion in the matter of severance and consolidation of causes.
  Guar. Fed. Sav. Bank v. Horseshoe Operating Co.
, 793 S.W.2d 652, 658 (Tex. 1990); 
Urdiales v. Concorde Techs. Del., Inc
., 120 S.W.3d 400, 408 (Tex. App.—Houston [14th
 Dist.] 2003, pet. denied).  To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.  
Downer v. Aquamarine Operators, Inc.
, 701 S.W.2d 238, 241-42 (Tex. 1985), 
cert. denied
, 476 U.S. 1159 (1986).  The controlling reasons for a severance are to do justice, avoid prejudice, and further convenience.  
Guar. Fed.
, 793 S.W.2d at 658.

According to the Brokers, the only common factors shared by Graben’s and Strickler’s lawsuits were their attorney and their complaints against Hutton.  Trying the claims together, the Brokers argue, effectively turned the trial into a “class action for two,” resulting in the admission of harmful evidence that would never have been heard in separate trials.  However, the Brokers never identify what this “harmful evidence” is, nor do they state any legal basis for how this “harmful evidence” would have been excluded in separate trials.  We hold that under these circumstances, the trial court did not abuse its discretion by denying the request for severance.  
See id.

B. Trial Court’s Refusal to Sever Negligent Supervision Claim Against ISI

The Brokers next assert error on the part of the trial court by failing to sever the Clients’ negligent supervision claim against ISI because it allowed into evidence the otherwise irrelevant facts that Hutton was a defendant in three lawsuits and the subject of four other complaints, along with a March 2004 letter from the NASD to ISI indicating that Hutton had a number of “reported sales practice disclosure [complaints].”  Even though ISI’s witness explained that these complaints were logged by the NASD regardless of merit and that the NASD had not determined that Hutton had committed any violations, the Brokers argued that this evidence was so prejudicial to Hutton’s defense that severance was required under rule 404 of the Texas Rules of Evidence, which prohibits the introduction of evidence related to a person’s character and bad acts.

At trial, however, when evidence of other complaints against Hutton was offered, the Brokers never objected to the evidence on the basis of Texas Rule of Evidence 404 regarding “other crimes, wrongs or acts.”  
Tex. R. Evid.
 404(b).  Further, witnesses testified without objection from the Brokers about a number of other complaints filed against Hutton.  When plaintiffs’ exhibit 16 (a complaint against Hutton) was offered, the Brokers did not object on the basis of rule 404.  Rather, the Brokers’ counsel simply stated that the evidence was “inadmissible, incomplete, and not consistent with counsel’s representations.”  Finally, when the Clients offered plaintiff’s exhibit 25, the NASD warning letter regarding Hutton, the Brokers’ counsel did not make a rule 404 objection; rather, they simply stated that the document was “not relevant and not probative.”

The complaint on appeal must be the same as that presented in the trial court.
  
See
 
Banda v. Garcia,
 955 S.W.2d 270, 272 (Tex. 1997)
. 
 Here, the Brokers’ rule 404 complaint on appeal was not raised at trial.  Consequently, they have failed to preserve this alleged error for our review.  
See
 
In re Y.M.A.
, 111 S.W.3d 790, 792 (Tex. App.—Fort Worth 2003, no pet.) (stating rule that legal basis for a complaint on appeal must be the same as the legal basis upon which the objection was made at trial)
.  Moreover, the Brokers have shown no harmful error even if the evidence were inadmissible. 
 See
 
Tex. R. App. P.
 44.1.

Second, the evidence of Hutton’s alleged other wrongful acts was admissible because it was clearly relevant to the factors that the jury was instructed to consider in question number 21, the punitive damage assessment question.  The Brokers never requested that the issue of punitive damages be bifurcated from the liability and actual damages issues at trial.

Finally, because evidence of Hutton’s alleged other wrongful acts was relevant to the punitive damage issues, and even assuming that this were inadmissible under rule 404, the Brokers were required under Texas Rule of Evidence 105 to obtain a limiting instruction.  
See
 
Tex. R. Evid.
 105, 404.  The Brokers did not make such a request.  Consequently, we hold that the trial court did not abuse its discretion by failing to sever the negligent supervision claim.  

C. Trial Court’s Charge Regarding Fiduciary Duty 

The Brokers next assert error on the part of the trial court by arguing that the trial court’s charge regarding fiduciary duty was tantamount to a directed verdict.  The standard of review for alleged jury charge error is abuse of discretion.  
Steak & Ale of Tex., Inc. v. Borneman
, 62 S.W.3d 898, 905 (Tex. App.—Fort Worth 2001, no pet.).  The trial court instructed the jury that “a relationship of trust and confidence exists between a financial or investment advisor and his client.”  Here, the Brokers again cite 
Schlumberger 
to argue that the relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the lawsuit.  
Schlumberger
, 959 S.W.2d at 171.  We have previously rejected this argument, and we hold that the trial court did not abuse its discretion by providing this instruction to the jury.  
See Steak & Ale
, 62 S.W.3d at 898. 

D. Trial Court’s Failure to Charge Jury on Proportionate Responsibility 

Finally, the Brokers argue that the trial court erred by failing to charge the jury on proportionate responsibility as among the Brokers and the Clients because the Clients could have directed Hutton to change their investments but did not.  Presumably, this is some type of negligence argument.  However, there was no negligence or other liability cause of action jury question proffered by the Brokers.  The statutory scheme for determining the percentage of responsibility—that is, the proportionate responsibility finding—contemplates that before the percentage responsibility question is submitted, a cause of action liability finding has been made by the jury.  
See
 
Tex. Civ. Prac. & Rem. Code Ann.
 § 33.003(a) (Vernon Supp. 2006); 
see also Romero v. KPH Consolidation, Inc.
, 166 S.W.3d 212, 225 (Tex. 2005).  Therefore, the trial court did not fail to submit a percentage of responsibility question to the jury when the Brokers did not request that a liability issue be submitted contemporaneously.  We overrule the Brokers’ third issue in its entirety.

VI.
 
 CONCLUSION

Because we have held that legally and factually sufficient evidence exists to support the jury’s verdict in favor of the Clients on their breach of fiduciary duty claims, we affirm that portion of the trial court’s judgment awarding $170,500 to Graben and $229,300 to Strickler in damages and disgorgement of commissions for their breach of fiduciary duty causes of action.  We reverse the remainder of the trial court’s judgment and render judgment that the Clients take nothing on their insurance code, negligence and negligent misrepresentation, and attorney’s fees causes of action, including their demands for “knowing” damages under the insurance code, punitive damages,  and attorney’s fees.  We remand this cause to the trial court for recalculation of prejudgment interest on the Clients’ breach of fiduciary duty damages award only. 

BOB MCCOY

JUSTICE

PANEL B: DAUPHINOT, GARDNER, and MCCOY, JJ.

DELIVERED: June 28, 2007

FOOTNOTES
1:
This identification is not meant to be an implication that these parties are “brokers” in the literal financial investment community sense but rather is used for identification purposes only. 

2:
However, before Strickler moved his investments, Hutton himself was proposing a change to Strickler’s investment strategy.  Hutton claimed to have a new computer program in which the investment strategy was “totally, diametrically, and dramatically different” than the one Hutton had been using.

3:
Although the Clients had two negligence causes of action, negligence and negligent misrepresentation, the jury awarded only one set of damages for the two causes of action.  For the sake of clarity we will refer generally to these claims as the Clients’ “negligence” claims. 

4:
In their brief, the Clients state that the judgment does not contain an award for the jury’s verdict on their negligence claims because they did not elect to recover on these claims.

5:
Hutton signed a letter to the Clients as an “investment advisor representative,” which in part stated that “I have it [a new computer system] programmed to help me do a better job of what you ultimately pay me to do, monitor your investments and keep you posted on any changes or recommendations to your financial plan.”  

6:
Hutton held 
series 6, 7, and 65 licenses from NASD. 

7:
The Brokers argue under their second issue that the Clients’ insurance code and negligence claims are barred under the applicable two-year statutes of limitation.  
Tex. Ins. Code Ann.
 § 541.162 (Vernon Supp. 2006); 
Tex. Civ. Prac. & Rem. Code Ann.
 § 16.003(a) (Vernon Supp. 2006).  Because we have held that there was legally insufficient evidence to uphold the insurance code claims and that the Clients’ negligence claims do not present their greatest possible recovery, we need not address this argument. 
See
 
Tex. R. App. P.
 47.1.

8:
The remainder of the Brokers’ first issue challenges the propriety of the trial court’s punitive damages award, double recovery to the Clients on their insurance code and breach of fiduciary duty claims, and award for “knowing” violations of the insurance code.  Because we have held that the evidence is insufficient to support the trial court’s judgment on the Clients’ insurance code and punitive damages claims, we need not address these remaining arguments.  
See
 
Tex. R. App. P.
 47.1.